**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

MARY SUE BUNDY

    *Plaintiff,*

*v.*

COMMISSIONER OF
SOCIAL SECURITY,

    *Defendant.*

_____/

CASE NO. 20-10254

HON. DAVID M. LAWSON
DISTRICT JUDGE

HON. PATRICIA T. MORRIS
MAGISTRATE JUDGE

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS MOTIONS FOR SUMMARY JUDGMENT (ECF Nos. 13, 15)

### I.    RECOMMENDATION

Plaintiff Mary Sue Bundy challenges Defendant Commissioner of Social Security's final decision denying her claim for Title II Disability Insurance Benefits ("DIB") and Title XVI Social Security Income (SSI). The case was referred to the undersigned for review. (ECF No. 4); *see* 28 U.S.C. § 636(b)(1)(B); E.D. Mich. LR 72.1(b)(3). For the reasons below, I conclude that substantial evidence supports the Commissioner's decision. Accordingly, I recommend **DENYING** Plaintiff's Motion for Summary Judgment, (ECF No. 13), and **GRANTING** the Commissioner's Motion, (ECF No. 15).

### II.    REPORT

#### A. Introduction and Procedural History

Plaintiff's application for DIB and SSI was filed on July 14, 2017. (ECF No. 10-5, PageID.226, 233.) She alleged she became disabled on May 30, 2017. (*Id*. at PageID.226.)

1

The Commissioner denied the claim on October 20, 2017. (ECF No. 10-4, PageID.160.) Plaintiff then requested a hearing before an administrative law judge ("ALJ"), which occurred on December 13, 2018. (ECF No. 10-2, PageID.82.) The ALJ issued a decision on January 25, 2019, finding that Plaintiff was not disabled. (ECF No. 10-2, PageID.58.) The Appeals Council denied review on December 3, 2019. (*Id.* at PageID.47.) Plaintiff sought judicial review on January 31, 2020. (ECF No. 1.) The parties filed cross-motions for summary judgment and briefing is complete. (ECF Nos. 13, 15.)

### B.  Standard of Review

The Court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The District Court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F. App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted). "[T]he threshold for such evidentiary sufficiency is not high. . . . It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions

of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286. (internal citations omitted).

### C. Framework for Disability Determinations

Disability benefits are available only to those with a "disability." *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. § 1382c(a)(3)(A). The Commissioner's regulations provide that disability is determined through the application of a five-step sequential analysis:

> (i) At the first step, we consider your work activity, if any. If you are doing substantial gainful activity, we will find that you are not disabled.
>
> (ii) At the second step, we consider the medical severity of your impairment(s). If you do not have a severe medically determinable physical or mental impairment that meets the duration requirement . . . or a combination of impairments that is severe and meets the duration requirement, we will find that you are not disabled.
>
> (iii) At the third step, we also consider the medical severity of your impairment(s). If you have an impairment(s) that meets or equals one of our listings in appendix 1 of this subpart and meets the duration requirement, we will find that you are disabled.
>
> (iv) At the fourth step, we consider our assessment of your residual functional capacity and your past relevant work. If you can still do your past relevant work, we will find that you are not disabled.
>
> (v) At the fifth and last step, we consider our assessment of your residual functional capacity and your age, education, and work experience to see if you can make an adjustment to other work. If you can make an adjustment

to other work, we will find that you are not disabled. If you cannot make an adjustment to other work, we will find that you are disabled.

20 C.F.R. § 404.1520; *see also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that [he or] she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The claimant must provide evidence establishing the residual functional capacity, which "is the most [the claimant] can still do despite [his or] her] limitations," and is measured using "all the relevant evidence in [the] case record." 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).

The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

**D. ALJ Findings**

Following the five-step sequential analysis, the ALJ determined that Plaintiff was not disabled. (ECF No. 10-2, PageID.77.) At step one, the ALJ found Plaintiff met the insured status requirements through December 31, 2021 and had not engaged in substantial gainful activity from the alleged onset date of May 30, 2017. (*Id*. at PageID.63.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: rheumatoid

arthritis; inflammatory arthritis; chronic pain syndrome; history of chronic epigastric pain; depression; and anxiety. (*Id*. at PageID.64.) Plaintiff also had non-severe impairments of restless leg syndrome and hypertension. (*Id.*) These impairments did not meet or medically equal a listed impairment at step three. (*Id.*) Next, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled a listed impairment, (*id*.), and had the residual functional capacity ("RFC"):

> to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: she can occasionally climb ramps and stairs, kneel, crouch, and crawl. She can frequently balance. She can never climb ladders, ropes, or scaffolds. She should avoid workplace hazards, such as unprotected heights and moving mechanical parts. She should avoid working in conditions of extreme heat and/or cold, or in conditions of extreme humidity or wetness. She should have a sit-stand option, wherein she can change positions, every 30 minutes, for one to two minutes in the immediate vicinity of the workstation. She is limited to simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work. She is limited to occasional interaction with supervisors, coworkers, and the general public.

(*Id*. at PageID.67-68.) At step four, the ALJ found Plaintiff was unable to perform any past relevant work. (*Id.* at PageID.76.) Finally, at step five, the ALJ determined that Plaintiff could perform a significant number of jobs in the national economy, including office helper, merchandise marker, and sorter. (*Id.* at PageID.76-77.) Accordingly, the ALJ concluded that Plaintiff was not disabled. (*Id.* at PageID.77.)

### E.  Administrative Record

### i.     Plaintiff's Testimony at the Administrative Hearing

Plaintiff testified that she attended school until 7th grade and then later earned a GED. (ECF No. 10-2, PageID.88.) She did not have any specialized skills. (*Id*.) Plaintiff

also testified that she was divorced and has 17-year-old child. (*Id*. at PageID.88-89.) She lived her with fiancée and his two sons, in addition to her son. (*Id*. a PageID.89.)

The ALJ questioned Plaintiff about her work history. (*Id*.)  Between 2014 and 2017 Plaintiff worked for Milan Metal Systems doing "production like assembly." (*Id*.) Her last date of employment was May 30, 2017. (*Id*.) She testified that she left that job due to severe pain and stated, "I had to keep sitting down and calling off work from my pain." (*Id*.) She also had previous work experience as a waitress and bartender in 2004 and later in 2008. (*Id*. at PageID.90-91.)

Plaintiff testified as to why she believed she can no longer work. She stated she has difficulty standing, sitting, "holding stuff," and using her hands. (*Id*. at PageID.91-92.) She needs approximately ten minutes to sit but can only sit for 10-15 minutes before she needs to get up. (*Id*. at PageID.92.) The most she can lift is approximately a gallon of milk. (*Id*.) Plaintiff testified that farthest she can walk is about a half of a block. (*Id*.) She uses a walker at home when her "feet are swelled up," although the walker was not prescribed by a doctor. (*Id*. at PageID.92-93.) Plaintiff stated that arthritis currently affects her feet, ankles, knees, hips, back, fingers, and wrists. (*Id*. at PageID.93.) Although medications "takes the edge off," Plaintiff still rated her pain as an eight out of ten. (*Id*.) Plaintiff does some stretching and physical therapy on her own at home. (*Id*. at PageID.94.)

On a typical day, Plaintiff will watch television, stretch, and do a little bit of housework. (*Id*. at PageID.96.) She usually sits on the couch and elevates her leg above her heart for 30 minutes every hour or two hours. (*Id*. at PageID.98.) Her fiancée does the laundry, the cooking, and the grocery shopping, but Plaintiff can microwave food. (*Id*. at

PageID.99.) They rent their home and Plaintiff's fiancée and children take care of the yard. (*Id*. at PageID.100.) Plaintiff can "wipe down counters, try to do dishes, stuff like that." (*Id*.) The youngest of the children in the house is 12 years old and Plaintiff testified that the children can, for the most part, take care of themselves. (*Id*.)

### ii.    The Vocational Expert's ("VE") Testimony at the Administrative Hearing

The VE identified Plaintiff's work as follows: 1) production assembler, DOT code 706.684-018, SVP 3, medium work, medium as performed, and 2) "a composite occupation" consisting of waitress, DOT code 311.477-030, SVP 3, light work, medium as performed; bartender, DOT code 312.474-101, SVP 3, light work, medium as performed; and bartender helper, DOT code 312.687-010, SVP 2, medium work, medium as performed. (*Id*. at PageID.102.) The ALJ inquired of a hypothetical individual of Plaintiff's age, education, and work history with the RFC to perform:

> light work except that she can occasionally climb ramps and stairs, kneel, crouch, and crawl; she can frequently balance; she can never climb ladders, ropes, or scaffolds; she should avoid workplace hazards such as unprotected heights and moving mechanical parts; she should avoid working in conditions of extreme heat and/or cold or in conditions of extreme humidity or wetness; she should have a sit/stand option wherein she can change positions every 30 minutes for [one to two] minutes in the immediate vicinity of the workstation.

(*Id.* at PageID.103-104.) The VE stated that such an individual could not perform Plaintiff's past relevant work. (*Id.* at PageID.104.) When asked what work, if any, would be available for such an individual, the VE prefaced his response by stating "the [DOT] does not—I repeat, does not[—]address the ability to alternate between sitting and standing and, therefore, any response that I give based upon this hypothetical is based upon my

experience and education in forensic rehabilitation as well as functional job analysis, my work in job placement, job coaching, and observation of how jobs are performed and I would rely upon limited universal studies." (*Id*. at PageID.104.) The VE then provided the following jobs as appropriate for the hypothetical individual posed by the ALJ: office helper, DOT code 239.567-010, SVP 2, approximately 70,000 jobs; merchandise marker, DOT code 209.587-034, SVP 2, approximately 80,000 jobs; and sorter, DOT code 209.687-026, SVP 2, approximately 70,000 jobs. (*Id*. at PageID.104-105.)

The ALJ posed a hypothetical individual who had all the same limitations as previously mentioned, but in addition, "is limited to simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work; and she is limited to occasional interaction with supervisors, coworkers, and the general public." (*Id*. at PageID.105.) The VE confirmed that the aforementioned jobs would still be available and appropriate for such an individual. (*Id*.) When asked if the original hypothetical individual could perform work at a sedentary exertional level, the VE responded that appropriate jobs would include address clerk, document preparer, and information clerk. (*Id*.) The ALJ posed an individual who could perform sedentary work only, but in addition, was "limited to simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work; and she is limited to occasional interactions with supervisors, coworkers, and general public." (*Id*.) The VE responded that such an individual could not perform the information clerk job, but could perform the remaining two suggested positions, and could also work as an inspector or spotter. (*Id*. at PageID.106.) If the hypothetical individual could only lift five pounds, the VE stated that he did not believe

there would be any jobs available for sure an individual. (*Id*.) The VE testified that his statements were consistent with the DOT, noting again the exception he previously discussed as to the sit-stand option. (*Id*. at PageID.107.)

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B). The newly promulgated regulations, applicable to applications for disability benefits filed on or after the effective date of March 27, 2017, distinguish between acceptable medical sources, medical sources and nonmedical sources. An acceptable medical source means a medical source who is a:

(1)   Licensed physician (medical or osteopathic doctor);

(2)   Licensed Psychologist, which includes:

    (i)   A licensed or certified psychologist at the independent practice level; or

    (ii)   A licensed or certified school psychologist, or other licensed or certified individual with another title who performs the same function as a school psychologist in a school setting, for impairments of intellectual disability, learning disabilities, and borderline intellectual functioning only;

(3)   Licensed optometrist for impairments of visual disorders, or measurement of visual acuity and visual fields only, depending on the scope of practice in the State in which the optometrist practices;

(4)   Licensed podiatrist for impairments of the foot, or foot and ankle only, depending on whether the State in which the podiatrist practices permits the practice of podiatry on the foot only, or on the foot and ankle;

(5)   Qualified speech-language pathologist for speech or language impairments only. For this source, qualified means that the speech-language pathologist must be licensed by the State professional licensing agency, or be fully certified by the State education agency

9

in the State in which he or she practices, or hold a Certificate of Clinical Competence in Speech-Language pathology from the American Speech-Language-Hearing Association;

(6)     Licensed audiologist for impairments of hearing loss, auditory processing disorders, and balance disorders within the licensed scope of practice only [];

(7)     Licensed Advanced Practice Registered Nurse, or other licensed advanced practice nurse with another title, for impairments within his or her licensed scope of practice []; or

(8)     Licensed Physician Assistant for impairments within his or her licensed scope of practice [].

20 C.F.R. § 404.1502(a).

A medical source is "an individual who is licensed as a healthcare worker by a State and working within the scope of practice permitted under State or Federal law, or an individual who is certified by a State as a speech-language pathologist or a school psychologist and acting within the scope of practice permitted under State or Federal law." *Id.*, § 404.1502(d).

In contrast, a nonmedical source means "a source of evidence who is not a medical source." *Id.*, § 404.1502(e). "This includes, but is not limited to: (1) You; (2) Educational personnel (for example, school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers); (3) Public and private social welfare agency personnel; and (4) Family members, caregivers, friends, neighbors, employers, and clergy." *Id.*

The SSA "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." *Id.*, § 404.1520c(a). "The most important

10

factors we consider when we evaluate the persuasiveness of medical opinions and prior administrative medical findings are supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section)." *Id.* The SSA will consider several factors when it contemplates "the medical opinion(s) and prior administrative medical findings" in a case. *Id.*

Of these factors, the first is "supportability." This factor considers that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(1).

The SSA will also consider the "consistency" of the claim. This includes the consideration that "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be[.]" *Id.*, § 404.1520c(c)(2).

In addition, the SSA will consider the "[r]elationship with claimant[.]" *Id.*, § 404.1520c(c)(3). This factor will include the analysis of:

(i)     Length of the treatment relationship. The length of time a medical source has treated you may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(ii)    Frequency of examinations. The frequency of your visits with the medical source may help demonstrate whether the medical source has a longitudinal understanding of your impairment(s);

(iii)   Purpose of the treatment relationship. The purpose for treatment you received from the medical source may help demonstrate the level of knowledge the medical source has of your impairment(s);

(iv)   Extent of the treatment relationship. The kinds and extent of examinations and testing the medical source has performed or ordered from specialists or independent laboratories may help demonstrate the level of knowledge the medical source has of your impairment(s);

(v)   Examining relationship. A medical source may have a better understanding of your impairment(s) if he or she examines you than if the medical source only reviews evidence in your folder[.]

*Id.* The fourth factor of the SSA's analysis is "specialization." In making this determination, the SSA will consider "[t]he medical opinion or prior administrative medical finding of a medical source who has received advanced education and training to become a specialist may be more persuasive about medical issues related to his or her area of specialty than the medical opinion or prior administrative medical finding of a medical source who is not a specialist in the relevant area of specialty." *Id.*, § 404.1520c(c)(4).

Finally, the SSA will consider "other factors." These may include any other factors that "tend to support or contradict a medical opinion or prior administrative medical finding." *Id.*, § 404.1520c(c)(5). "This includes, but is not limited to, evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of our disability program's policies and evidentiary requirements." *Id.* Further, when the SSA considers "a medical source's familiarity with the other evidence in a claim, we will also consider whether new evidence we receive after the medical evidence source made his or her medical opinion or prior administrative medical finding makes the medical opinion or prior administrative medical finding more or less persuasive." *Id.*

12

As to the duty to articulate how persuasive the medical opinions and prior administrative medical findings are considered, the new regulations provide "articulation requirements." The ALJ will consider "source-level articulation." Pursuant to this requirement, "[b]ecause many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." *Id.*, § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The regulations stress that the "factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be." *Id.*, § 404.1520c(b)(2). As such, the SSA "will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the

factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record." *Id.*

When medical opinions or prior administrative findings are "equally persuasive," "well-supported" and "consistent with the record" "about the same issue," "but are not exactly the same, [the ALJ] will articulate how [he or she] considered the other most persuasive factors[] for those medical opinions or prior administrative medical findings in [the claimant's] determination or decision." *Id.*, § 404.1520c(b)(3).

The regulations clarify that the SSA is "not required to articulate how we considered evidence from non-medical sources using the requirements of paragraphs (a) through (c) of this section." *Id.*, § 404.1520c(d).

In addition, the regulations expressly state that the SSA will not consider "evidence that is inherently neither valuable nor persuasive" and "will not provide any analysis about how we considered such evidence in our determination or decision, even under § 404.1520c." *Id.*, § 404.1520b(c). The regulations categorize evidence that is inherently neither valuable nor persuasive as: "[d]ecisions by other governmental and nongovernmental entities;" "[d]isability examiner findings," meaning, "[f]indings made by a State agency disability examiner made at a previous level of adjudication about a medical issue, vocational issue, or the ultimate issue about whether you are disabled;" and "[s]tatements on issues reserved to the Commissioner[;]" these statements include:

(i)    Statements that you are or are not disabled, blind, able to work, or able to perform regular or continuing work;

14

(ii)    Statements about whether or not your impairment(s) meets or medically equals any listing in the Listing of Impairments[];

(iii)   Statements about what your residual functional capacity is using our programmatic terms about the functional exertional levels [] instead of descriptions about your functional abilities and limitations[];

(iv)    Statements about whether or not your residual functional capacity prevents you from doing past relevant work[];

(v)     Statements that you do or do not meet the requirements of a medical-vocational rule[]; and

(vi)    Statements about whether or not your disability continues or ends when we conduct a continuing disability review[.]

*Id.*, § 404.1520b(c).

The regulations also provide that "[b]ecause a decision by any other governmental and nongovernmental entity about whether you are disabled, blind, employable, or entitled to any benefits is based on its rules, it is not binding on us and is not our decision about whether you are disabled or blind under our rules." *Id.*, § 404.1504. Therefore, the Commissioner "will not provide any analysis in our determination or decision about a decision made by any other governmental or nongovernmental entity about whether you are disabled, blind, employable, or entitled to benefits." *Id.* The Commissioner will, however, "consider all of the supporting evidence underlying the other governmental or nongovernmental entity's decision that we receive as evidence in your claim[.]" *Id.*

The regulations clarify that "[o]bjective medical evidence means signs, laboratory findings, or both." *Id.*, § 404.1502(f). Signs are defined as "one or more anatomical, physiological, or psychological abnormalities that can be observed, apart from your statements (symptoms)." *Id.* Further, "[s]igns must be shown by medically acceptable

clinical diagnostic techniques. Psychiatric signs are medically demonstrable phenomena that indicate specific psychological abnormalities, e.g., abnormalities of behavior, mood, thought, memory, orientation, development or perception, and must also be shown by observable facts that can be medically described and evaluated." *Id.*, § 404.1502(g). Laboratory findings "means one or more anatomical, physiological, or psychological phenomena that can be shown by the use of medically acceptable laboratory diagnostic techniques[,]" and "diagnostic techniques include chemical tests (such as blood tests), electrophysiological studies (such as electrocardiograms and electroencephalograms), medical imaging (such as x-rays), and psychological tests." *Id.*, § 404.1502(c).

The most recent amendments to the regulations also tweaked the manner in which the SSA evaluates symptoms, including pain. "In considering whether you are disabled, we will consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. We will consider all your statements about your symptoms, such as pain, and any description your medical sources or nonmedical sources may provide about how the symptoms affect your activities of daily living and your ability to work[.]" *Id.*, § 404.1529(a).

But the SSA clarified, "however, statements about your pain or other symptoms will not alone establish that you are disabled. There must be objective medical evidence from an acceptable medical source that shows you have a medical impairment(s) which could reasonably be expected to produce the pain or other symptoms alleged and that, when considered with all of the other evidence (including statements about the intensity and

16

persistence about your pain or other symptoms which may reasonably be accepted as consistent with the medical signs and laboratory findings), would lead to a conclusion that you are disabled." *Id.*, § 404.1529(a).

Further, "[i]n evaluating the intensity and persistence of your symptoms, including pain, we will consider all of the available evidence, including your medical history, the medical signs and laboratory findings, and statements about how your symptoms affect you." *Id.*, § 404.1529(a). The SSA clarified that it will "then determine the extent to which your alleged functional limitations and restrictions due to pain or other symptoms can reasonably be accepted as consistent with the medical signs and laboratory findings and other evidence to decide how your symptoms affect your ability to work." *Id.*

Finally, the SSA noted that "[b]ecause symptoms sometimes suggest a greater severity of impairment than can be shown by objective medical evidence alone, we will carefully consider any other information you may submit about your symptoms." This other information may include "[t]he information that your medical sources or nonmedical sources provide about your pain or other symptoms (e.g., what may precipitate or aggravate your symptoms, what medications, treatments or other methods you use to alleviate them, and how the symptoms may affect your pattern of daily living)," which "is also an important indicator of the intensity and persistence of your symptoms." *Id.*, § 404.1529(c)(3).

"Because symptoms, such as pain, are subjective and difficult to quantify, any symptom-related functional limitations and restrictions that your medical sources or nonmedical sources report, which can reasonably be accepted as consistent with the

objective medical evidence and other evidence, will be taken into account…We will consider all of the evidence presented, including information about your prior work record, your statements about your symptoms, evidence submitted by your medical sources, and observations by our employees and other persons[.]" *Id.* The regulations establish that "[f]actors relevant to your symptoms, such as pain, which we will consider include []:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

*Id.*

The new regulations also impose a duty on the claimant: "In order to get benefits, you must follow treatment prescribed by your medical source(s) if this treatment is expected to restore your ability to work." *Id.*, § 404.1530(a). Stated differently, "[i]f you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits." *Id.*, § 404.1530(b). Acceptable (or "good") reasons for failure to follow prescribed treatment include:

(1)     The specific medical treatment is contrary to the established teaching and tenets of your religion;

18

(2)     The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment;

(3)     Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment;

(4)     The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

(5)     The treatment involves amputation of an extremity, or major part of an extremity.

*Id.*, § 404.1530(c).

### G. Arguments and Analysis

Plaintiff argues that the ALJ erred by assigning little weight to Dr. Bohnsack and some weight to Dr. Tejero. Specifically, Plaintiff posits that the ALJ "granted each opinion a weight rather than articulating how persuasive she found each opinion . . . Thus . . . utilizing the inapplicable regulations." (ECF No. 13, PageID.1043-44.) Plaintiff further argues that "even assuming this weight can be translated into a persuasiveness finding in accordance with the prevailing regulations, the explanation the ALJ provided was not sufficient under either regulatory edict." (*Id.* at PageID.1044.) Plaintiff does not appear to argue that Dr. Bohnsack's or Dr. Tejero's opinions be given a particular weight, which would be a function of the treating-source rule, but that the ALJ failed to properly articulate her views on the medical opinion.

As a preliminary matter, Plaintiff's disability application was filed on July 14, 2017. (ECF No. 10-5, PageID.226, 233.) Her case was filed after March 27, 2017, and accordingly, the evaluation of Plaintiff's case is not subject to the treating-source rule

19

stated in 20 C.F.R. § 404.1527; formerly, "good reasons" was the explanation for the weight given to a treating source's medical opinion. Now, the ALJ must consider the medical opinions in the case and articulate their persuasiveness with the factors established by 20 C.F.R. § 404.1520c.

The ALJ summarized Dr. Bohnsack's opinion, highlighting his notes that Plaintiff had symptoms of depression  that would "constantly interfere with her attention and concentration in the work setting[,]" and "could only use the bilateral upper extremities approximately five percent of the time . . ." for example. (ECF No. 10-2, PageID.73.) After considering the evidence from Dr. Bohnsack, the ALJ assigned his opinion little weight and stated:

> the opinion of Dr. Bohnsack is inconsistent with the treatment notes from his own office, which fail to show that the claimant has limitations consistent with his opinion. Furthermore, the opinion of Dr. Bohnsack is inconsistent with the records from the Milan Family Practice and the University of Michigan Medical Center, which show that the claimant retains an adequate range of function in the bilateral upper extremities and remains ambulatory despite limitations in standing or walking secondary to arthritic pains.

(*Id.*) Similarly, regarding Dr. Tejero, the ALJ made note of his opinion that Plaintiff would "have serious deficiencies in areas requiring dealing with normal stress and maintain attendance[,]" but that she "would be able to perform satisfactory in most all other areas of employment despite her limitations." (*Id.*) The ALJ considered the opinion and accompanying evidence from Dr. Tejero, assigned his opinion some weight, and stated:

> Dr. [Tejero] has a treatment history with the claimant and has had the opportunity to observe the claimant in a variety of settings. Additionally, the undersigned notes that the opinion of Dr. [Tejero] is consistent with portions of Dr. Oliver-Brannon's opinion, which suggest that the claimant would have a positive prognosis with continued use of psychotropic medications.

20

> However, the undersigned notes that Dr. [Tejero]'s opinion is somewhat inconsistent with the treatment notes from the Lenawee Community Mental Health Authority, which suggest that she would have more than mild limitations in concentration and social function secondary to chronic pain, irritability, and anxiety/depression.

(*Id.* at PageID.74.)

In contrast to the opinion of Dr. Bohnsack, the ALJ relied upon evidence from various medical offices that Plaintiff visited. First, the ALJ noted an evaluation from the University of Michigan Medical Center. (*Id.* at PageID.69.) This evaluation reflected lab tests showing positive results for rheumatoid arthritis, which Plaintiff was placed on medication for. (*Id.* at PageID.69-70.) The ALJ made note of reports from the Milan Family Practice which showed Plaintiff "had a generally positive response to the medications for her rheumatoid arthritis[,]" although she developed some "gastric issues secondary to her use of steroid medications." (*Id.* at PageID.70.) Then the ALJ noted an evaluation from IHA Ann Arbor Orthopedic Specialists, which reported that Plaintiff "maintained 5/5 motor strength in the bilateral lower extremities." (*Id.*) Notes from Chelsea Professional Services, the ALJ wrote, provided that Plaintiff's Achilles tendon remained in tact and there was no evidence of tearing (despite a prior x-ray from Milan Family Practice that showed a "one-centimeter nodule on the posterior aspect of the Achilles tendon.") (*Id.*) Upon re-evaluation at IHA Ann Arbor Orthopedics, Plaintiff presented "no evidence of joint deformities secondary to her arthritic symptoms, nor any evidence of acute changes in mood or orientation secondary to her mental health impairments[,]" the ALJ noted. (*Id.*) For her gastric reflux symptoms Plaintiff visited Huron Gastroenterology, and the ALJ noted that she "required only conservative intervention in the form of medications for her

GERD-like symptoms." (*Id.* at PageID.70-71.) The ALJ referred to another Milan Family Practice report which stated that despite Plaintiff's symptoms she "remained ambulatory[;]" treatment notes also provided that she "was found to have only mild signs and symptoms of weakness secondary to musculoskeletal pains and tenderness." (*Id.* at PageID.71.) Finally, the ALJ made note of records from St. Joseph Mercy Pain Institute, which reflected that although Plaintiff "continued to report pain over the hands, feet, knees, and feet [sic], her progress reports show that she remained ambulatory and show that she maintained adequate motor strength in the bilateral upper and lower extremities." (*Id.*) Treatment notes show that Plaintiff described her own pain as "generally mild to moderate with continued participation in treatment." (*Id.* at PageID.72.)

The ALJ thoroughly analyzed the record and explained her reasoning in departing from Dr. Bohnsack's opinion. I suggest that the ALJ adequately articulated her reasoning for assigning little weight to Dr. Bohnsack's opinion, noting the differing reports between Dr. Bohnsack and the several other medical providers and reports in the record.

And in contrast to the opinion of Dr. Tejero, the ALJ noted records inconsistent with his opinion from the Lenawee County Community Health Authority. My own review of the record reveals evidence from the Parkside Family Counselling, to which Plaintiff was referred from the Lenawee County Mental Health Authority, that stated on September 4, 2018, Plaintiff was identified as having an intact memory, normal thought process with logical content, clam motor activity, normal affect, speech and mood, intact judgment, adequate attire, hygiene, and grooming, and was cooperative. (ECF No. 10-11, PageID.704.) Dr. Tejero's progress notes indicated that Plaintiff would be "seriously

limited, but not precluded" in the areas of maintaining attention for two hours, completing a normal workweek without interruptions from psychologically based symptoms, and dealing with normal work stress. (*Id*. at PageID.670.) Dr. Tejero's progress report defined "seriously limited, but not precluded" as "the ability to function in this area is seriously limited and less than satisfactory, but not precluded in all circumstances." (*Id*.) The report indicated only performing at a consistent pace without an unreasonable number and length of rest periods as "unable to meet competitive standards." (*Id*.)

The ALJ assigned some weight to this opinion but noted that it was inconsistent with a Lenawee County Mental Health Alliance report that suggested "she would have more than mild limitations in concentration and social function[.]" (ECF No. 10-2, PageID.74.) Where these reports concluded Plaintiff had *more* restrictions than Dr. Tejero believed, I suggest that the ALJ actually acted in Plaintiff's favor by acknowledging those reports and giving Dr. Tejero's opinion *less* than great weight[1] in light of those more restrictive reports.

Indeed, Plaintiff acknowledges this, but seems to argue that this reason is precisely why the ALJ erred: "The only explanation given as to the weight granted Dr. Tejero's opinion was that his opinion was not restrictive enough. This certainly leaves a reviewing party to wonder why she did not include the more restrictive limitations opined." (ECF No. 13, PageID.10-50-1051.) On the contrary, the ALJ's analysis and explanation clearly state

---

[1] To this end, the ALJ accommodated Plaintiff's mental RFC by assigning only "simple tasks in a routine work setting, but not at a production rate pace, for example, no assembly line work. She is limited to occasional interaction with supervisors, coworkers, and the general public." (ECF No. 10-2, PageID.67-68.) I note that Plaintiff does not take issue with the RFC here, instead only arguing that the ALJ erred in failing to adequately explain her assignment of weight to Dr. Tejero's opinion.

why she gave only some weight to the opinion. She noted the differences between Dr. Tejero's opinion and several other sources, including the Lenawee County Mental Health Alliance and another doctor's medical opinion. I suggest that finding Dr. Tejero's opinion inconsistent with other evidence does not mean the ALJ must have fully adopted the opposing evidence—indeed, it appears that the ALJ, by still assigning some weight to Dr. Tejero's opinion, considered both his opinion and the evidence from the other sources and attempted to find  a middle ground. I suggest that the ALJ adequately articulated her reasoning for assigning some weight to Dr. Tejero's opinion, noting the differing reports between Dr. Tejero and the Lenawee County Mental Health Alliance.

A key feature of the supportability factor for persuasiveness is that with more relevant "objective medical evidence and supporting explanations presented by a medical source to support his or her medical opinion . . .", the more persuasive the medical opinion will be. 20 C.F.R. § 404.1520c(c)(2). When the ALJ states that the opinions of Drs. Bohnsack and Tejero are inconsistent with the objective evidence throughout the record, she is simply weighing the objective evidence in terms of supportability as promulgated by the regulations. Here, the ALJ discussed evidence which shows records of several doctor appointments that do not reveal or suggest limitations to the extent that Drs. Bohnsack's and Tejero's opinions suggest. And, as the ALJ noted, even Dr. Bohnsack's own reports in the record seem to contradict his opinion: in a report from March 20, 2018, Dr. Bohnsack noted that Plaintiff had "no swelling noted at this time in bilateral hands[,]" normal range of motion in her hand, and normal strength in her lower extremities. (ECF No. 10-12, PageID.738.)

Defendant points out that "[t]he Commissioner's reading of SSR 96-8p is also consistent with the new opinion regulations, which require a 'minimum level of articulation.' *Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844, 5858 (Jan. 18, 2017). As the agency explained in its final rule comments, the regulatory changes to the treating physician rule were necessary because courts reviewing ALJ decisions became too focused on 'whether [the ALJ] sufficiently articulated the weight [she] gave treating source opinions, rather than on whether substantial evidence supports [her] final decision.' *Id*. at 5853; *see also Hearings, Appeals & Litigation Law Manual*, § I-5-3-30.II." (ECF No. 15, PageID.1083-1084.)

To this end, Defendant argues that "[a]lthough SSR 96-8p can and should be read in harmony with the amended opinion regulations, Plaintiff presents SSR 96-8p as a way to circumvent the more relaxed articulation requirements in 20 C.F.R. §§ 404.1520c, 416.920c (PageID.1043, 1047, 1049-50). The Court must decline the invitation." (*Id*.) I suggest that Defendant's argument and reading of the regulations is persuasive.

Based upon my review of the record, I suggest that the ALJ's decision on the matter of Dr. Bohnsack's and Dr. Tejero's opinions is both adequately articulated and supported by substantial evidence. Using this same record evidence to arrive at a contrary conclusion would be reweighing the evidence, and "the court will not reweigh the evidence considered by the ALJ." *Seibert v. Comm'r of Soc. Sec.*, 2019 WL 147066 at *2 (E.D. Mich. 2019) (citing *Big Ranch Res., Inc. v. Ogle*, 737 F.3d 1063, 1074 (6th Cir. 2013)). Whether Plaintiff or even this Court disagrees with the conclusions of the ALJ, if it is supported by substantial evidence, it must not be disturbed.

Finally, to the extent that Plaintiff argues the ALJ considered "only the evidence that supports her position." (ECF No. 13, PageID.1045), as Defendant points out, "what Plaintiff characterizes as selective citation to the record could be 'described more neutrally as weighing the evidence.' *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 284 (6th Cir. 2009)." (ECF No. 15, PageID.1079.) The above analysis readily reflects the ALJ's thorough reading of the record and consideration of all available information. If the ALJ did not rely on some particular piece of the record which supports Plaintiff's position, that is because the ALJ's duty is to weigh all of the evidence—and, in contrast, the ALJ has no duty to recite and analyze every piece of the record: "Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for [the ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions and prior administrative medical findings in [each] case record." 20 C.F.R. § 404.1520c(b)(1).

"Instead, when a medical source provides multiple medical opinion(s) or prior administrative finding(s), [the ALJ] will articulate how [he or she] considered the medical opinions or prior administrative findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate." *Id.* The regulation reiterates that the ALJ is "not required to articulate how [he or she] considered each medical opinion or prior administrative finding from one medical source individually." *Id.*

The above analysis considers where the ALJ did, though, note contrasting reports and evidence, and assigned those opinions or records little or some weight accordingly.

This reflects the ALJ's careful reading and weighing of all the evidence in making her decision.

### H. Conclusion

For these reasons, I suggest that substantial evidence supports the Commissioner's denial of benefits, and I recommend **DENYING** Plaintiff's Motion, (ECF No. 13), and **GRANTING** the Commissioner's Motion, (ECF No. 15).

### III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  January 29, 2021

S/ PATRICIA T. MORRIS
Patricia T. Morris
United States Magistrate Judge